United States Court of Appeals,

Eleventh Circuit.

Nos. 94-9098, 94-9158.

Mathew HAMILTON, By and Through Lovelurn HAMILTON, his next friend, Lovelurn Hamilton, Administratrix of the Estate of Kim Orlena Hamilton, Una Hamilton, Plaintiffs-Appellees,

v.

Charles CANNON, in his official capacity as Sheriff of Macon County, Georgia, Ronald Duncan, Macon Co., GA, a political subdivision of the State of Georgia, Michael Tookes, Defendants-Appellants,

The Macon County Sheriff's Department, The Macon County/City of Montezuma, Georgia, Department of Parks and Recreation, The City of Montezuma, Georgia, Police Department, Freddy Mallard, Logan Walton, XYZ Pool Management Company, Defendants,

The City of Montezuma, Lonnie Brown, Defendants-Appellees.

Mathew HAMILTON, By and Through Lovelurn HAMILTON, his next friend, Lovelurn Hamilton, Administratrix of the Estate of Kim Orlena Hamilton, Una Hamilton, Plaintiffs-Appellants,

v.

Charles CANNON, in his official capacity as Sheriff of Macon County, Georgia, Ronald Duncan, Macon Co., GA, a political subdivision of the State of Georgia, City of Montezuma, and Lonnie Brown, Defendants-Appellees,

The Macon County Sheriff's Department, et al., Defendants.

April 19, 1996.

Appeals from the United States District Court for the Middle District of Georgia. (No. 92-CV-276-3-MAC), Duross Fitzpatrick, Chief Judge.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and FAY, Senior Circuit Judge.

CARNES, Circuit Judge:

These appeals arise from the tragic death of Kim Orlena Hamilton at a Montezuma, Georgia municipal swimming pool. The three plaintiffs—Hamilton's mother, Hamilton's minor child, and the

Administratrix of Hamilton's estate—brought this action in federal district court alleging constitutional claims under 42 U.S.C. § 1983 and state law negligence claims. [1]  The complaint named as defendants Macon County, Georgia;  Macon County Deputy Sheriff Ronald Duncan (in his individual and official capacities);  and Macon County Sheriff Charles Cannon (in his official capacity only).  We refer to these defendants as "the county defendants." The complaint also named as defendants the city of Montezuma;  Michael Tookes, a lifeguard at the swimming pool (in his individual and official capacities);  and Lonnie Brown, the manager of the pool (in his individual and official capacities).  We refer to these defendants as "the city defendants."[2]

The district court granted summary judgment to all of the defendants on the plaintiffs' state law negligence claims, *Hamilton v. Cannon,* 864 F.Supp. 1332, 1338 (M.D.Ga.1994), and we have jurisdiction over that judgment pursuant to 28 U.S.C. § 1292(b). The plaintiffs' appeal of that ruling is our case number 94-9158. The court also granted Lonnie Brown summary judgment on the section 1983 claims, in his individual capacity, on the ground of qualified immunity.  *Id.*  However, the court denied Tookes' and Duncan's motions for summary judgment on the section 1983 claims, in their individual capacities, holding that they were not entitled to qualified immunity.  *Id.*  We have jurisdiction over Tookes' and Duncan's appeal of that decision under *Mitchell v. Forsyth,* 472

---

[1]Hamilton's mother has since been dismissed from the case and is not a party to this appeal.

[2]Additional defendants were also named, but the claims against those defendants have been settled.

U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and their appeal of that ruling is our case number 94-9098. The part of the case involving the plaintiffs' federal claims against these individual defendants in their official capacities, and against Macon County and the City of Montezuma, is not before us.[3]

Although two appeals with two different case numbers are before us, they are based on the same record and the same evidence. The district court disposed of the defendants' motions for summary judgment on the plaintiffs' state law negligence claims and the defendants' motions for summary judgment on the federal claims in a single order. We have consolidated the two appeals for decisional purposes.

## I. The Facts and Procedural Background

The procedural posture of these cases requires us to view the facts, which are drawn from the pleadings, affidavits, and depositions, in the light most favorable to the plaintiffs. *Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994). What we consider to be facts for present purposes may not turn out to be the actual facts if the case goes to trial. *Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995). Viewed from the present perspective, however, we take the facts to be as follows. On July 6, 1990, Hamilton, who was fourteen years old, accompanied her sister and a friend to the Hill Street municipal swimming pool in

[3]Macon County attempts to piggyback onto the interlocutory appeal by Tookes and Duncan an appeal from the district court's denial of summary judgment for the county. But we do not have jurisdiction over the district court's denial of summary judgment to the county, which was not a final judgment on the merits, an interlocutory appeal certified pursuant to 28 U.S.C. § 1292(b), or a decision denying qualified immunity.

Montezuma, Georgia.  Hamilton did not know how to swim and did not intend to enter the pool, but a boisterous group of swimmers engaging in horseplay threw her into the water.  The ultimate result of this "dunking" was Hamilton's death.

Tookes assisted in managing the pool and served as lifeguard. He had received no formal lifeguard training nor any instruction with respect to drownings or other potential emergencies at the pool.  After Hamilton was thrown in the pool, she collapsed trying to get out of the water.  All Tookes knew to do was to remove her from the pool and place her on the edge of it.  Immediately after Tookes removed Hamilton from the pool, Sharon Simpson, a bystander who was trained in CPR, began administering CPR in an attempt to revive Hamilton.  Tookes stood by and wiped Hamilton's mouth from time to time.  After Simpson initiated CPR, Hamilton appeared to begin shallow breathing and to revive slightly.  There is testimony that Hamilton held her head up, began to cough, and moved her arm. Simpson felt a pulse and saw Hamilton trying to respond by moving her eyes.  Additionally, Hamilton moved her head in response to her name.  Tookes believed Hamilton was recovering and in no danger of dying.

While this rescue attempt was underway, Macon County Deputy Sheriff Ronald Duncan arrived at the scene.  Duncan ordered everyone to clear the area around Hamilton.  Despite Simpson's objections, Duncan specifically ordered her away from Hamilton. Duncan then examined Hamilton's condition, but did not himself undertake CPR efforts or take any other medical action on her behalf, apparently believing that Macon County's emergency medical

technicians would arrive immediately after him. Those medical technicians had been called and were enroute, but unfortunately, they were confused about the location and mistakenly went to another public swimming pool located several blocks away. This mistake delayed their arrival by several minutes, and during that time no one provided medical attention to Hamilton.

Once Simpson realized that Deputy Duncan had no intention of administering CPR, she ran to her nearby home to retrieve her Red Cross CPR certification card. Simpson was gone approximately five minutes, and during that time neither Duncan, Tookes, nor the Montezuma police officers who arrived in the interim provided any medical attention to Hamilton. Upon Simpson's return, the medical technicians still had not arrived, and Duncan permitted Simpson to recommence CPR. Soon afterward, the technicians did arrive, having learned this swimming pool's location from persons at the other pool. Unfortunately, Hamilton had already passed the point at which medical assistance could be of benefit. She was declared dead soon after.

### II. The Section 1983 Claims and Tookes' and Duncan's Claims of Qualified Immunity, Appeal No. 94-9098

A. Background

The plaintiffs presented claims pursuant to 42 U.S.C. § 1983, which provides a tort remedy against persons acting under color of state law for deprivations of rights secured by federal law. Before a person, county, or municipality can be held liable under section 1983, a plaintiff must establish that she suffered a constitutional deprivation. *E.g., Bradberry v. Pinellas County,*

789 F.2d 1513, 1515 (11th Cir.1986). Further, to impose *individual* liability on public officers, the plaintiff must prove that the defendants violated not only a constitutional right, but a "clearly established" constitutional right; otherwise the defendants are protected by qualified immunity. *E.g., Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146 (11th Cir.1994) (en banc).

To overcome the qualified immunity defense, the contours of the right allegedly violated must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. *E.g., Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). That is to say, "[u]nless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter,* 28 F.3d at 1149. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993).

The district court denied Tookes' and Duncan's motions for summary judgment on qualified immunity grounds. The court held that, viewing the evidence in the light most favorable to the plaintiffs, the plaintiffs did state a claim for the violation of a constitutional right, and that Tookes and Duncan were not protected by qualified immunity because the constitutional right claimed to have been violated was clearly established at the time of their alleged conduct. We will first discuss the plaintiffs'

claim against Duncan, which is stronger than their claim against Tookes.

B. Duncan

The sole constitutional right that the plaintiffs allege Duncan violated is the Fourteenth Amendment's prohibition against the deprivation of life, liberty, or property without due process of law. The issue before us is therefore whether, in view of what we take to be the facts for present purposes, Duncan's failure to provide an adequate rescue, or his action in barring private rescue attempts, ran afoul of a clearly established constitutional right. The district court held it did and therefore denied Duncan's motion for summary judgment. We review this question of law *de novo.* *E.g., Swint,* 51 F.3d at 994.

The plaintiffs concede that, absent special circumstances, individuals—even government officials—are under no duty to provide rescue.[4] However, "there are times when the Constitution requires local governmental units to provide basic protective services to individuals with whom the government has created a special relationship." *Bradberry,* 789 F.2d at 1516 n. 2. The plaintiffs' position on the merits is that under the facts, the special relationship exception applies to impose liability on Duncan. Because Duncan's qualified immunity defense is the issue at hand,

---

[4]There is no general duty to rescue a stranger in distress, even if the rescue can easily be accomplished. *See, e.g., Jackson v. City of Joliet,* 715 F.2d 1200, 1202 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). And the fact that the defendant is a public officer adds nothing. "[A] mere failure to rescue is not tortious just because the defendant is a public officer whose official duties include aiding people in distress." *Id.*

in order to prevail in this appeal the plaintiffs must convince us that any special relationship law specifically imposing liability under these factual circumstances was clearly established at the time of Hamilton's death, July 6, 1990.

The plaintiffs argue that a special relationship arose, imposing an affirmative constitutional duty upon Duncan, when Duncan cleared the area around Hamilton and instructed Simpson to discontinue CPR efforts, thereby implicitly taking responsibility for Hamilton. The plaintiffs rely on three cases to establish with the requisite clarity that under these circumstances a special relationship was created between Duncan and Hamilton, so that a negligent or reckless rescue attempt, or interference with a bystander's rescue attempt, violated the Constitution.

The first case the plaintiffs point to as clearly establishing this proposition of law is *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Supreme Court held that the government did not violate the constitutional rights of a four-year-old child, who was in the custody and control of his natural father, when his father beat him severely. The county officials had been aware that the father was abusing his child, and at one point the county had taken the child into custody after he was admitted to a local hospital with suspicious bruises and abrasions. However, the child was released to his father after only three days in protective custody. For the next six months, a county caseworker made monthly visits to the DeShaney home, during which she observed a number of suspicious injuries to the child's head. The caseworker recorded

these incidents in her files. The child was admitted to the emergency room once again for injuries believed to be caused by child abuse. Still, the county officials did not take the child into custody. On the caseworker's next two visits to the DeShaney home, she was told the child was too ill to see her, and no action was taken. A few months later, DeShaney beat his child so severely that the child suffered permanent brain damage and was rendered profoundly retarded.

Despite repeated indications that DeShaney was abusing his child, county officials had done nothing to protect the child. Even under those egregious circumstances, the Supreme Court held that there was no violation of any constitutional duty. In so holding, the Court distinguished cases involving persons who were in custody, such as prisoners and persons committed to mental institutions, from the general public, holding that public officials have no duty to protect individuals, generally. *Id.* at 198-201, 109 S.Ct. at 1004-06.

Although *DeShaney* held that there was no constitutional violation in that case, the plaintiffs attempt to extract from *DeShaney* a clearly established rule that a state has an affirmative duty to protect people when the state imposes a limitation on the individual's freedom to act on her own behalf. But *DeShaney* reached no such holding, and instead held that the failure of the government actors in that case to "rescue" the young child from the abusive father to whom the child had been returned did not violate the Constitution. If anything, the holding in *DeShaney* establishes that the rule the plaintiffs seek is far from clearly established.

The plaintiffs also rely upon our decision in *Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030 (11th Cir.1987), which held that a county government's practice of using its emergency medical vehicles to transport patients only to hospitals that guarantee the payment of the county's medical bills does not violate any right protected by the federal Constitution. Toni Wideman, who was at the time four months pregnant, began experiencing abdominal pain. She called her obstetrician, who instructed her to come immediately to Piedmont Hospital. Wideman called the 911 emergency telephone number and requested an ambulance to take her to Piedmont. Wideman asked the Emergency Medical Service employees who responded to her call to take her to Piedmont where her doctor was waiting, but because of the county's policy they refused and instead took Wideman against her wishes to a different hospital. The attending physician at that hospital spoke by phone to Wideman's obstetrician at Piedmont and, after a substantial delay, Wideman was transferred to Piedmont. At that point, however, Wideman's obstetrician was unable to stop her labor, and Wideman gave birth to a premature baby, who survived for only four hours. *Id.* at 1031.

The *Wideman* Court held that the county's practice of transporting emergency patients only to certain hospitals did not violate the Constitution. *Id.* at 1036. In so holding, the Court discussed at some length the "special relationship" cases. Quoting from a Seventh Circuit decision, the Court observed that " "[t]he contours of what constitutes a "special relationship" between a municipality, acting through its officials, and its citizens are

hazy and indistinct.' " 826 F.2d at 1035 (quoting *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986)). The Court went on to state: "It is possible, however, to discern certain general guidelines regarding the existence of such a right-duty relationship," and then observed that "[t]he primary thread weaving these special relationship cases together is the notion that if the state takes a person into custody ... or assumes responsibility for that person's welfare, a "special relationship' may be created in respect of that person." *Id.* The only example given was in the prison context. The *Wideman* Court stated that "a constitutional duty can arise only when a state or municipality, by exercising a significant degree of custody or control over an individual, places that person in a worse situation than he would have been had the government not acted at all." *Id.* Then came the following statement, upon which the plaintiffs in this case place much emphasis: "Such a situation could arise by virtue of the state affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.*

Those passages from *Wideman* are clearly dicta, because they were in no way essential to *Wideman* 's holding of no liability. The law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law. *See, e.g., Jones v. White,* 992 F.2d 1548, 1566 (11th Cir.) ("[F]or law-of-the-circuit purposes ... [the review of any precedent] ought to focus far more *on the judicial*

*decision than on the judicial opinion.*" (citation and quotation marks omitted) (alterations in original)), *cert. denied,* --- U.S. ----, 114 S.Ct. 448, 126 L.Ed.2d 381 (1993).

The district court thought that the *Wideman* case clearly established that Duncan's actions in this case violated Hamilton's constitutional rights. The district court drew from *Wideman* the general proposition that a constitutional duty can arise when a state or municipality exercises a significant degree of custody or control over an individual and places that individual in a worse situation than if the government had not acted at all. [5] The *Wideman* Court said that such a situation could arise if the government affirmatively placed an individual in a position of danger or cut off potential sources of private aid; but the *Wideman* opinion itself characterized those statements as only "general guidelines." 826 F.2d at 1035. Moreover, the general propositions discussed in *Wideman* had little to do with the facts of that case, which in turn are not sufficiently similar to the

---

[5]This Court and others have extended the state custody exception beyond actual incarceration or involuntary institutionalization only when there is some kind of physical restraint by the state that triggers an affirmative constitutional duty of care and protection. We explained in *Lovins v. Lee* that "special relationship decisions stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The duty in such cases arises from the limitations which the government has imposed on the freedom of the individual to act on his own behalf." 53 F.3d 1208, 1210 (11th Cir.1995) (citation and quotation marks omitted). If a person's attendance in an area is voluntary, and she was not physically placed there by the state, she cannot be considered to be in custody and subject to the exception discussed in *Wideman. See Rogers v. City of Port Huron,* 833 F.Supp. 1212, 1218 (E.D.Mich.1993).

facts of this case. *See Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994) ("the question in this case, as in all qualified immunity cases, is fact specific"); *Adams v. St. Lucie County Sheriff's Dep't.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting) ("The facts need not be the same as the facts of the immediate case. But they do need to be materially similar."), *approved en banc,* 998 F.2d 923 (11th Cir.1993). In short, the district court relied upon dicta from *Wideman* as having clearly established the law, something that dicta cannot do.

Finally, the plaintiffs rely upon our holding in *Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). In that decision we held that a town could have violated the constitutional rights of a town employee when it placed work release inmates in close proximity to the employee who had no choice, if she wanted to keep her job, but to continue working around the inmates. *Id.* at 356. *Cornelius* did not involve any rescue-type situation. Its facts are far removed from the present case.[6] We held in *Lassiter* that, "[f]or the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's

---

[6]Further, *Cornelius'* viability is questionable in light of the Supreme Court's subsequent decision in *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), which held, in effect, that no special relationship for substantive due process purposes arises from an employment relationship with the government. *Id.* at 127-28, 112 S.Ct. at 1070. We noted in *Lovins,* 53 F.3d at 1211, that two panels of this Court have expressed doubt about the continuing validity of *Cornelius* in the wake of *Collins.*

place, that "what he is doing' violates federal law." 28 F.3d at 1149. *Cornelius* did not develop the law in the context of a law enforcement officer failing to provide competent rescue services or interrupting a bystander's rescue efforts. Consequently, it cannot have clearly established the law applicable to the present case.

In summary, the three cases that the plaintiffs rely upon did not develop the law plaintiffs assert in a sufficiently concrete and factually defined context to serve as the basis for the denial of qualified immunity in this case. The concrete and factually defined contexts of those three cases make them distinguishable from this one.[7] We said in *Lassiter* that the most common error we encounter in qualified immunity cases involves the point that "courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract "rights.' " *Id.* at 1150. We emphasized that "[g]eneral propositions have little to do with the concept of qualified

---

[7]The case that most strongly lends support to plaintiffs' position is the Seventh Circuit decision in *Ross v. United States,* 910 F.2d 1422 (7th Cir.1990). In *Ross,* the Seventh Circuit, under factual circumstances more egregious than those in this case, held that recklessness can establish a due process violation when the defendant state actor's interference with rescue attempts by other officials disregards a "known and significant risk of death." *Id.* at 1433. However, even if *Ross* were indistinguishable, Seventh Circuit decisions can not clearly establish the law for purposes of qualified immunity in this circuit. *E.g., D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995) ("The remaining cases on which plaintiffs rely do not come from the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court and, therefore, cannot show that plaintiffs' right to due process was clearly established."); *Courson v. McMillian,* 939 F.2d 1479, 1497-98 & n. 32 (11th Cir.1991) (law can be "clearly established" for qualified immunity purposes by decisions of U.S. Supreme Court, Eleventh Circuit Court of Appeals, or highest court of state where case arose).

immunity" and that the facts of a case relied upon to clearly establish the law must "be materially similar," because "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Id.* (citation and quotation marks omitted). It would take much creativity and imagination to glean from the factually distinguishable cases upon which the plaintiffs rely a clearly established rule of law that an unsuccessful, negligent, or reckless rescue attempt, or interference with a bystander's rescue attempt, amounts to a constitutional violation. We decline to exercise such creativity and imagination, because qualified immunity doctrine prohibits it.

The district court should have granted Duncan's motion for summary judgment in his individual capacity on qualified immunity grounds.

C. Tookes

We now turn to the district court's order denying Tookes' motion for summary judgment, in his individual capacity, on qualified immunity grounds. All Tookes did was remove Hamilton from the pool and place her on the ground beside it. The plaintiffs do not contend that Tookes interfered with Simpson's rescue attempt, or that he affirmatively did anything at all improper. They simply contend that he should have done more.

Everything we said as to Duncan applies equally, or with even more force, to Tookes. There are no decisions clearly establishing that Tookes' alleged nonfeasance rises to the level of a constitutional violation. At oral argument, the plaintiffs conceded that if Tookes had left Hamilton in the pool to drown,

that inaction would not have violated Hamilton's constitutional rights. However, plaintiffs argue that because Tookes rescued Hamilton from the pool he incurred a constitutional duty to continue rescue efforts even if he was not properly trained to do so. We doubt that the Constitution requires such a rule of law, under which some rescue effort is worse than none from the rescuer's perspective. Although we do not have occasion to pass on the merits of the plaintiffs' constitutional claim against Tookes, we note that it does border on the frivolous.

The district court should have granted summary judgment to Tookes in his individual capacity on qualified immunity grounds. We turn now to the plaintiff's state law negligence claims.

### III. The State Law Negligence Claims, Appeal No. 94-9158

The plaintiffs brought various state law negligence claims against the city defendants and the county defendants. The district court granted summary judgment to all of the defendants on these negligence claims, relying on Georgia's "public duty" doctrine as established by *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861 (1993). Originating in 1993, the public duty doctrine represents a relatively recent development in Georgia law. In *Jordan,* a sexual assault victim brought a negligence suit against the City of Rome for failing to dispatch a police car to her home after the victim's sister had made several calls requesting police assistance. The Georgia Supreme Court held that, "where failure to provide police protection is alleged, there can be no liability based on a municipality's duty to protect the general public." *Jordan,* 426 S.E.2d at 863. However, the court further held that

"the municipality may be subject to liability for the nonfeasance of its police department" in circumstances where there exists a "special relationship" between the municipality and the individual. *Id.* The court then set up a three-pronged test to determine whether such a special relationship exists. Satisfaction of the test requires:

> (1) an explicit assurance by the municipality, through promises or actions, that it would act on behalf of the injured party;
>
> (2) knowledge on the part of the municipality that inaction could lead to harm; and,
>
> (3) justifiable and detrimental reliance by the injured party on the municipality's affirmative undertaking.

*Id.* The court adapted this test from the rule in a New York case, *Cuffy v. City of New York,* 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987).

Applying the test to the facts of *Jordan,* the Georgia Supreme Court held that no special relationship existed between the victim and the municipality because the "detrimental reliance" element of the test could not have been met where the victim did not speak to the police and could not have known whether they had made any promise of assistance. *Jordan,* 426 S.E.2d at 864.

The district court in this case applied the same reasoning in granting summary judgment to the defendants on the state law negligence claims. Turning directly to the third prong of the test, the court reasoned that, because Hamilton was unconscious at the time, she could not have relied on any undertaking of the defendants. *Hamilton,* 864 F.Supp. at 1338. More specifically, the court noted that "she was incapable of taking any affirmative act

that might signify reliance." *Id.* The district court explained: "As Georgia law now stands it appears that municipalities can be held liable for their negligence only if the injured party is conscious and communicating, but once the victim becomes incapable of expressing assent municipal liability ceases." *Id.*

The plaintiffs argue that the "special relationship" test of *Jordan* does not control this case. Although they state the argument in several ways, the plaintiffs' basic position boils down to this syllogism:

> (1) *Jordan* applies to cases of failure to provide police protection;
>
> (2) This case has nothing to do with failure to provide police protection;
>
> (3) Therefore, *Jordan* is irrelevant to the determination of this case.

With respect to the city defendants, the plaintiffs argue that *Jordan* is plainly inapplicable because the state law negligence claims against the city defendants have nothing whatsoever to do with police conduct and, additionally, that *Jordan* only applies to nonfeasance, not affirmative acts of negligence.

With respect to the county defendants, the plaintiffs' argument is a slightly different variation on the same theme. First, the plaintiffs argue that although police conduct is involved in the case against the county defendants, the claims against those defendants are based on negligent interference with a private rescue effort rather than failure to provide police protection. Making the point in a slightly different way, the plaintiffs argue that, quite separate from any "special relationship" duty owed to Hamilton by Duncan under the *Jordan*

analysis, Duncan owed Hamilton an independent duty to exercise ordinary care once he had taken control of the situation and had ordered Simpson to stop administering CPR.  Additionally, the plaintiffs argue that, even if *Jordan* applies to the claims against the county defendants, the district court erred in its application of the reliance prong of the test by requiring "an affirmative act that might signify reliance."  *Id.*  They argue that *Jordan* did not expressly set up an affirmative act requirement and that, under the circumstances, reliance should be implied or imputed to Hamilton by others at the scene.

In general, the defendants' arguments are the converse of the plaintiffs' arguments;  the defendants argue for a broad interpretation of *Jordan* to insulate them from liability.  Both the city defendants and the county defendants contend *Jordan* applies outside the realm of police conduct and applies both to affirmative acts of negligence as well as nonfeasance.  The city defendants also point out that the plaintiffs have not alleged that the city defendants committed any affirmative negligent acts with respect to Hamilton and thus even if *Jordan* only shields defendants in cases of nonfeasance, it still shields them.

The plaintiffs' position that *Jordan* is limited to failure to provide police protection, or to municipal *non*feasance, would seem to be a plausible interpretation of the decision.  The opinion contains no less than five references that lend support to this view. *See Jordan,* 426 S.E.2d at 862 ("when considering ... *failure to provide police protection*") (emphasis added);  862 n. 2 ("We wish to point out that this case involves the municipality's

*failure* to act, as opposed to any affirmative act of negligence."); 863 ("where *failure* to provide police protection is alleged") ("*nonfeasance* of [municipality's] police department") (emphasis added); 863 n. 4 ("where a police officer is present at the scene ... yet *does not act* ") (emphasis added). Nonetheless, *Jordan* does not expressly say that its applicability is to be limited to situations of police nonfeasance, and there is some indication to the contrary.

For example, in *City of Lawrenceville v. Macko,* 211 Ga.App. 312, 439 S.E.2d 95 (1993), some homeowners sued the City of Lawrenceville alleging that the city was negligent in failing to properly inspect property prior to the issuance of a building permit. The Georgia Court of Appeals held that the city's sovereign immunity defeated the plaintiffs' claims. *Id.* 439 S.E.2d at 98-99. In the alternative, the court held that even in the absence of sovereign immunity, the public duty doctrine of *Jordan* would have operated to prevent recovery because the plaintiffs had not shown that the city owed them a duty of care greater than it owed the general public. *Id.* at 99.

The only other reported Georgia case we have found that involves *Jordan* is *Georgia Department of Transportation v. Brown,* 218 Ga.App. 178, 460 S.E.2d 812 (1995). In *Brown,* the survivors of a motorist who was killed at an intersection sued the Georgia DOT because the DOT opened the road with two-way stop signs prior to completion, rather than the four-way traffic lights that the plans required. The court held that the public duty doctrine of *Jordan* did not apply where the legislature had provided for a remedy under

the Georgia Tort Claims Act. *Id.* at 817. However, the court was not required to determine whether *Jordan* would have barred recovery in the absence of a statutory right of action.

Determining the applicability of *Jordan* to this case is problematic. The *Jordan* decision itself represents the only time the Georgia Supreme Court has spoken to the issue, but the language of the opinion may not delineate the limits of the doctrine it announces. One Georgia appellate court case, *Macko,* seems to signal an expansive application while the more recent decision in *Brown* declined to extend the doctrine. Although both the plaintiffs and defendants cite to extra-territorial case law to buttress their *Jordan* arguments, those cases are not particularly helpful because they do not determine the correct rule in Georgia and because they are in conflict.

Application of the *Jordan* public duty doctrine outside the police nonfeasance context has significant public policy ramifications, and we are in doubt about the matter. When such doubt exists as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary state law guesses and to offer the state court the opportunity to interpret or change existing law. *Mosher v. Speedstar Div. of AMCA Int'l, Inc.,* 52 F.3d 913, 916-17 (11th Cir.1995). "Only through certification can federal courts get definitive answers to unsettled state law questions. Only a state supreme court can provide what we can be assured are "correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law." *Sultenfuss v. Snow,*

35 F.3d 1494, 1504 (11th Cir.1994) (en banc) (Carnes, J., dissenting), *cert. denied,* --- U.S. ----, 115 S.Ct. 1254, 131 L.Ed.2d 134 (1995).

While we could make an *Erie*[8] guess as to the applicability of the *Jordan* public duty doctrine to this case, we have determined that the more prudent course is to submit the issue to the Georgia Supreme Court. Accordingly, we respectfully certify the following questions of law to the Supreme Court of Georgia:[9]

(1) Does the "public duty doctrine" established in *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861 (1993), apply outside the police protection context and in the circumstances of this case?

(2) Does the *Jordan* public duty doctrine apply to affirmative acts of negligence, such as those alleged in this case, in addition to failures to act?

(3) Does the "reliance prong" of the *Jordan* special relationship test require an objective manifestation of assent by the plaintiff, or may assent be inferred from the reliance of others or from the circumstances of this case?

---

[8] *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

[9] Additionally, the defendants argue that even if the *Jordan* public duty doctrine is inapplicable to these facts, we should affirm the summary judgment in their favor on the basis of lack of causation, or the Georgia "good Samaritan" statute. The district court relied solely on the *Jordan* public duty doctrine in granting summary judgment to the defendants on the state law negligence claims. The district court declined to reach the merits of these additional defenses, and so do we. If it is necessary to consider these defenses after the Georgia Supreme Court answers our certified questions regarding the applicability of the *Jordan* doctrine, we will do so at that time.

(4) Does the *Jordan* special relationship test apply when a law enforcement officer acts with gross negligence in performing duties at the scene of an emergency, as is alleged in this case, such that the officer would not otherwise be shielded from liability by Ga.Code Ann. § 35-1-7 (1993)?

Our statement of the questions is not meant to limit the scope of inquiry by the Supreme Court of Georgia. On the contrary:

> [T]he particular phrasing used in the certified question[s] [are] not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given....

*Martinez v. Rodriguez,* 394 F.2d 156, 159 n. 6 (5th Cir.1968). The entire record in this case, together with copies of the briefs of the parties, is transmitted herewith.

QUESTIONS CERTIFIED.

### IV. Conclusion

We REVERSE the district court's denial of summary judgment to Tookes and Duncan in their individual capacities insofar as the federal constitutional claims are concerned. We CERTIFY the state law issues to the Georgia Supreme Court, and we WITHHOLD any decision about the district court's grant of summary judgment on the state law claims until we receive the answers to that certification.[10]

---

[10]The time for any rehearing petitions and suggestions will not begin to run in either of these two appeals, which we have consolidated, until we have disposed of the state law claim issues following the Georgia Supreme Court's decision of the certified questions.