United States Court of Appeals,

Eleventh Circuit.

Nos. 95-2799, 95-3653.

Carol WYKE, individually and as personal representative of the Estate of Shawn David Wyke, a minor deceased, Plaintiff-Appellee,

v.

POLK COUNTY SCHOOL BOARD, Max Linton, individually and as Principal of McLaughlin Junior High School of Polk County, and James Butler, individually and as Vice-Principal of McLaughlin Junior High School of Polk County, Defendants-Appellants.

CAROL WYKE, individually and as personal representative of the Estate of Shawn David Wyke, a minor deceased, Plaintiff-Appellant,

v.

POLK COUNTY SCHOOL BOARD, Max Linton, individually and as Principal of McLaughlin Junior High School of Polk County, and James Butler, individually and as Vice-Principal of McLaughlin Junior High School of Polk County, Defendants-Appellees.

Nov. 19, 1997.

Appeals from the United States District Court for the Middle District of Florida. (No. 91-1457-Civ-T-24C), Elizabeth A. Jenkins, Magistrate Judge.

Before ANDERSON, Circuit Judge, and KRAVITCH and FAY, Senior Circuit Judges.

FAY, Senior Circuit Judge:

This litigation arises from the tragic suicide of a 13 year old boy. The trial court dismissed the federal claim, submitted the common law negligence questions to the jury, and entered judgment based upon the jury verdict. These consolidated appeals raise the following issues: (1) whether plaintiff's § 1983 claim was so "insubstantial" as to deprive the district court of federal question jurisdiction; (2) whether the defendants violated plaintiff's constitutional rights by failing to provide her son with suicide intervention services or by failing to notify her of her son's suicide attempt; (3) whether, under Florida law, the Polk County School Board owed any duty to prevent Shawn's

suicide; and (4) whether, under *Fabre v. Marin,* 623 So.2d 1182 (Fla.1993), the trial court submitted the proper parties to the jury for the apportionment of liability under Florida's comparative fault statute. We find (1) that the trial court had jurisdiction to entertain plaintiff's § 1983 claim, (2) that plaintiff failed to establish a violation of any constitutional rights, and (3) that the Polk County School Board had a duty to notify plaintiff of her son's suicide attempts, which occurred on school grounds, during school hours. Issue (4) is an open question under Florida law, and we certify that question to the Florida Supreme Court.

I.

A.

This suit arose from circumstances surrounding the death of plaintiff Carol Wyke's thirteen-year old son, Shawn, who committed suicide at home on the evening of October 17, 1989. The trial court dismissed Wyke's federal claim, submitted the common law negligence questions to the jury, and entered judgment based upon the jury verdict. The evidence presented at trial, which for appeal purposes we must construe in the light most favorable to Wyke, revealed that in the few days before his death, Shawn twice attempted suicide at school, during school hours. School officials, who were made somewhat aware of both incidents, failed to hold Shawn in protective custody, failed to provide or procure counseling services for Shawn, and failed to notify either Wyke or Shawn's "grandmother," Helen Schmidt,[1] of the attempts. Prior to his actual death, neither Wyke nor Schmidt had any knowledge of Shawn's suicidal intent, but both were aware that Shawn had

---

[1]Shawn was living with Schmidt, the mother of Wyke's ex-boyfriend, at the time of his death. When Wyke and Shawn first moved to Florida, they became very close to Schmidt, and Schmidt permitted both of them to live in her house. About two weeks before her son's death, Wyke moved out of the Schmidt home and into a hotel/apartment. She intended for Shawn to move in with her as soon as she could earn more money, but that eventuality never came to pass. Tragically, Shawn hanged himself from a tree in Schmidt's backyard.

emotional and behavioral problems, which indicated to them a need for counseling.[2]

Shawn's first known suicide attempt occurred on October 16th in the boys' restroom at school. Shawn was found in the restroom by another student, Jonathan, trying to hang himself with a football jersey. The two boys talked and eventually left the restroom together. When Jonathan got home from school, he told his mother, Brenda Morton, about the incident.[3] Morton immediately phoned the school,[4] and spoke with a man whose voice she recognized as Jim Bryan, the school's Dean of Students. Morton relayed Jonathan's story to Bryan. Bryan recognized the seriousness of the situation, and assured Morton that "he would take care of it."[5]

Bryan responded to the situation by calling Shawn into his office.[6] He read Shawn some

---

[2]Schmidt made an appointment for Shawn to see a mental health counselor, but Shawn's death occurred before the scheduled appointment. Schmidt testified that Wyke had considered getting counseling for Shawn at an earlier date, but no appointment was ever made.

[3]Jonathan told no one at school about the incident because he did not want Shawn to be angry with him, or to be thought of as a "snitch."

[4]Morton did not know Wyke personally.

[5]Morton's testimony:

> He didn't introduce himself to me; I just knew it was Mr. Bryan. And I explained to him what my son had told me. He thanked me for calling and he told me he would take care of it. He said that what I expressed to him ... was something very serious, that there was a problem here, and that somebody needed to do something or somebody needed to speak to Shawn about this. And he said: Thank you very much. Have a nice day. And I let it go at that point.

R5-19. Bryan denied ever speaking with Morton on the telephone.

[6]The evidence concerning Bryan's discussion with Shawn comes solely from Wyke's own testimony. A few weeks after Shawn's death, Wyke went to the school to pick up Shawn's belongings. While there, she met with Bryan, and asked him about some rumors that she had heard at Shawn's funeral concerning the school's knowledge of Shawn's predicament. Bryan then reportedly told her of his meeting with Shawn. Bryan, however, denied ever meeting with Shawn, or telling Wyke about any counseling effort.

verses from the Bible, and talked about their meaning with him.[7] Shawn appeared very upset in the beginning, but seemed to feel better after talking with Bryan. Bryan believed that he had done "all he [could] do with Shawn that day," and took no other action with regard to Shawn's suicide attempt.[8] When asked by Wyke why he did not notify anyone else of the situation, Bryan responded that "there was just too much red tape" and that he thought "he had it under control."[9] Morton

---

[7]Wyke's testimony:

> I told [Bryan] I wanted to know what happened. And he proceeded to tell me on October 16th, the day before Shawn had—had died, a boy came to him, a child.... [The child] came to him and told him about Shawn. And he talked to Shawn....
>
> I asked him what he talked to Shawn about.... And he proceeded to tell me that him and Shawn—Shawn had talked about verses in [the] Bible and that he felt Shawn was fine....
>
> And I asked him, why did he read the Bible? He said that's the way he thought he more or less could handle—you know, talking to Shawn with scripture.

    R4-52, 54.

[8]Wyke's testimony: "I asked him, Why didn't he call somebody? He said he didn't expect that [Shawn] would do something like that and proceeded to tell me that he doesn't feel guilty for what he did, that he tried all he can do with Shawn that day." R4-53.

[9]Wyke's testimony:

> And I asked him, Why didn't he tell somebody like the principals? And he told me that there was just too much red tape for all of this, that he thought he had it under control....
>
> I asked him about calling the police—calling home first. He said he wasn't allowed to do that, because he had called people before—called people—parents, apparently, before on topics. I don't know what he meant by that.... He just said he had called parents before, and he just wasn't allowed to do that.
>
> I had asked him, Why didn't he call the police or the HRS? And he just put up his hands like this (demonstrating) and told me he did everything he could.

    R4-53.

testified at trial that had she known Bryan was not going to notify Wyke of Shawn's suicide attempt, she would have done so herself.

Although unclear when, Shawn's second suicide attempt also occurred in the boys' restroom. Marlene Roberts, a school custodian, testified that she and a student—who Roberts could not positively identify as Shawn—were in the cafeteria one day, talking about the child's problems with his grandmother. The student went to the restroom and was gone longer than Roberts felt he should have been. When she went to check on him, the boy emerged and said that if he had stayed in the restroom any longer, he would have killed himself. Roberts jokingly told the student that she would do it for him; they both laughed, and the boy went back to the cafeteria. Roberts then went into the restroom, where she found a coat hanger and cord hanging from the ceiling. She threw them into the trash and also went to the cafeteria. There, Roberts saw James Butler, the school's Vice-Principal, and told him that a boy had been talking about killing himself. She did not specifically identify the boy, nor did she tell Butler about the coat hanger and cord. Butler responded by asking Roberts if she could not find anything else to do.[10] The next day or the day after that, Roberts heard that a student had committed suicide; she did not know if it was the same student she had spoken with.

Several experts in the field of suicide prevention testified about the need for suicide prevention training in public schools. These witnesses testified that the Polk County School Board ("School Board" or "Board") provided inadequate training for school administrators and teachers. An adequate training program would have involved mandatory written policies requiring parental notification, holding students in protective custody, and arranging for counseling services. The

---

[10]Butler denied ever conversing with Roberts about a suicidal student. He testified that he had had experience with two suicidal students in the past. In both cases, he brought the student into his office, called the parents, and referred them for counseling services.

experts further indicated that without training, school employees would tend to underestimate the "lethality" of suicidal thoughts, statements, or attempts. The experts' ultimate conclusion was that if the School Board's employees had been adequately trained in suicide prevention, Shawn would not have committed suicide on October 17, 1989.

B.

Wyke, individually and as personal representative of Shawn's estate, filed suit pursuant to 42 U.S.C. § 1983 against the School Board and both the Principal and Vice-Principal of McLaughlin Junior High School (collectively, "Defendants"),[11] alleging that the Defendants' failure to train employees in suicide intervention/prevention constituted deliberate indifference to Wyke's constitutional rights to the care, custody, management, companionship, and society of her son. Wyke also asserted a pendent state wrongful death claim, arising from the alleged breach of Defendants' duty to supervise Shawn. In both the federal and state claims, Wyke asserted that Shawn's death foreseeably resulted from the Defendants' failure to (i) notify her of Shawn's suicide attempt, (ii) hold Shawn in protective custody, (iii) procure psychiatric intervention and counseling for Shawn, or (iv) provide appropriate support and guidance for Shawn.

Defendants responded to Wyke's complaint with a motion to dismiss for lack of subject matter jurisdiction. They argued that the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), clearly foreclosed Wyke's § 1983 claim, because under *DeShaney,* the School Board had no constitutional duty to protect Shawn from harming himself while he was in his own home. Absent such a duty,

---

[11]Although our docket sheet indicates that the Principal and Vice-Principal were sued in both their individual and official capacities, Wyke indicated at trial that she was only suing them in their official capacities. Regardless, they were both dismissed, and neither is involved in this appeal.

Defendants argued, there could be no constitutional violation for the Defendants' failure to provide Shawn with suicide intervention services. *DeShaney* thus rendered Wyke's federal claim too "insubstantial" to support federal question jurisdiction under 28 U.S.C. § 1331. And because there was no diversity of citizenship, it followed that the court lacked jurisdiction to hear Wyke's state wrongful death claim.

The district court denied Defendants' motion to dismiss. Defendants answered, and pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before a United States Magistrate Judge. During the presentation of Wyke's case, Defendants moved for judgment as a matter of law on both the federal and state claims. Fed.R.Civ.Pr. 50(a). As to the federal claim, Defendants reasserted their *DeShaney* argument, and emphasized that Wyke had failed to establish any "policy" for which the School Board, as a local government entity, could be held liable under § 1983. As to the state claim, Defendants argued that their duty to supervise Shawn did not extend to nonschool activities, occurring after school hours.

The trial court denied Defendants motion on both claims, but subsequently ruled that the individual defendants should be dismissed. The School Board, as the only remaining defendant, renewed its motion for judgment as a matter of law at the end of Wyke's case. The court reserved ruling. At the close of all the evidence, the Board again made its motion. Finally, the court agreed that *DeShaney* was an insurmountable hurdle, and granted the motion as to the federal claim. The state claim, however, was submitted to the jury.[12]

The jury returned a verdict for Wyke, finding that the School Board negligently failed to supervise Shawn, that the failure was the proximate cause of his death, that the total damages were

---

[12]After dismissing the federal claim, the court chose to retain jurisdiction over the state claim in the interests of judicial economy, convenience, and fairness. The statute of limitations on the state wrongful death claim had already run.

$500,000, and that the percentage of fault attributable to the School Board was 33%. The remaining 67% of fault was attributed to Wyke (32%) and to Schmidt (35%) as "*Fabre* defendants." The court entered a $165,000 judgment in favor of Wyke, that being the portion of the entire damage award attributable to the School Board. Both Wyke and the School Board filed timely notices of appeal.

Wyke now challenges the trial court's grant of judgment as a matter of law in favor of the School Board on her § 1983 claim. The School Board challenges the trial court's initial exercise of jurisdiction and its denial of the Board's motion for judgment as a matter of law on the state claim. Both Wyke and the School Board challenge the manner in which Wyke's state claim was submitted to the jury.

## II.

The School Board first contends that the district court should have dismissed this case for lack of subject matter jurisdiction. The Board, citing *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), argues that Wyke failed to present a substantial federal question under 28 U.S.C. § 1331, and thus that the district court lacked jurisdiction to hear the pendent state law claim. We disagree.

Absent diversity of citizenship, a plaintiff must present a "substantial" federal question in order to invoke the district court's jurisdiction. *Hagans v. Lavine,* 415 U.S. 528, 537, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974). An "insubstantial" federal question is one that is either "obviously without merit," or one that is clearly foreclosed by previous Supreme Court decisions. Those decisions must "leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Id.* (quoting *Ex parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933)). Previous decisions that merely render claims doubtful or of questionable merit do not render them insubstantial for jurisdictional purposes. *Id.*

In *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that a state had no constitutional duty to protect a child, Joshua, against beatings by his father, even though the state was aware of the father's abuse and had at one time taken custody of the child. The Court rejected the proposition that states have a general constitutional duty to protect their citizens from private violence, and noted that each previous case in which it had found a constitutional duty to protect involved a custodial relationship between the injured individual and the state. *DeShaney,* 489 U.S. at 198-201, 109 S.Ct. at 1004-1006. In those custodial situations, it was the "[s]tate's affirmative act of restraining the individual's freedom to act on his own behalf," which triggered a "corresponding duty to assume some responsibility for [the individual's] safety and general well-being." *Id.* at 200, 109 S.Ct. at 1005. The facts of *DeShaney,* however, presented a different situation:

> Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201, 109 S.Ct. at 1006.

The School Board insists that *DeShaney* clearly precluded Wyke's § 1983 claim because Shawn's death did not occur at the hands of a state actor and because Shawn was not in state custody at the time of his death. Wyke counters that *DeShaney,* by its own terms, does not apply when the state's actions render an individual "more vulnerable" to harm. Wyke's argument is that if Bryan had not told Morton he would "take care" of Shawn's situation, then Morton would have notified Wyke of Shawn's suicide attempt. In turn, Wyke would have helped her son, and Shawn would not have

died. Because Bryan affirmatively interfered, however, Shawn was deprived of his mother's support and was placed in a worse situation than he would have been had the school not acted at all. Bryan's interference, as the argument goes, triggered a duty on the part of the school to provide Shawn with that support which it had taken away.

We cannot say that Wyke's argument was so "insubstantial," "clearly foreclosed," or "obviously without merit" as to deprive the court of subject matter jurisdiction. The language of *DeShaney* does indeed "leave room" for state liability where the state creates a danger or renders an individual more vulnerable to it. *DeShaney,* 489 U.S. at 210, 109 S.Ct. at 1011. Exactly what type of state action fits within that exception has been the subject of considerable debate since *DeShaney.* *See Cornelius v. Town of Highland Lake,* 880 F.2d 348, 356 (11th Cir.1989) (distinguishing *DeShaney* where state created dangerous situation and rendered plaintiff more vulnerable to it);[13] *Kneipp v. Tedder,* 95 F.3d 1199, 1208-11 (3rd Cir.1996) (finding that *DeShaney* does not bar § 1983 claim where police officers' interference rendered intoxicated plaintiff more vulnerable to harm); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993) (reading *DeShaney* to imply that if police officers in some way assisted in creating or increasing danger, due process rights would be implicated); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993) (stating that "*DeShaney* ... leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger"); *Freeman v. Ferguson,* 911 F.2d 52, 54-55 (8th Cir.1990)

---

[13]Several panels of this Court have questioned the vitality of *Cornelius*'s holding after the Supreme Court's decision in *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). *See Mitchell v. Duval County Sch. Bd.,* 107 F.3d 837, 839 n. 3 (11th Cir.1997) (per curiam); *Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1531 n. 6 (11th Cir.1996); *Lovins v. Lee,* 53 F.3d 1208, 1211 (11th Cir.1995); *Wooten v. Campbell,* 49 F.3d 696, 700 n. 4 (11th Cir.), *cert. denied,* U.S. , --- U.S. ----, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995); *Wright v. Lovin,* 32 F.3d 538, 541 n. 1 (11th Cir.1994). We need not decide today whether *Cornelius* remains good law.

(concluding that *DeShaney* does not bar § 1983 claim where injury by private actor was also result of "an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community—with such interference increasing the vulnerability of [the victim] to the actions of [the private individual]...."). We agree that *DeShaney* may have rendered Wyke's constitutional claim doubtful from the beginning, but mere doubt is not enough to deprive the district court of federal question jurisdiction.

That Wyke's § 1983 claim ultimately fails does not alter our jurisdictional analysis.[14] It is "well settled that the failure to state a cause of action calls for a judgment on the merits"—one which can only be made after and not before the court has assumed jurisdiction over the controversy. *Hagans v. Lavine,* 415 U.S. 528, 542, 94 S.Ct. 1372, 1381, 39 L.Ed.2d 577 (1974) (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). The district court did not err in denying Defendants' motion to dismiss.

III.

We review de novo the trial court's decision to grant or deny a motion for judgment as a matter of law. *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 439 (11th Cir.1996). In so doing, we must view the evidence in the light most favorable to the nonmoving party. *Id.* The motion should be granted only if "reasonable people in the exercise of impartial judgment could not arrive at a contrary verdict." *Id.*

A.

Wyke maintains that she has a viable claim under § 1983. She argues that the School Board's failure to train its employees in suicide prevention and intervention constituted deliberate indifference to her substantive due process rights. We conclude that Wyke has failed to establish

---

[14]*See infra* Part III.A. (discussing merits of Wyke's § 1983 claim).

a violation of any constitutional right.

Section 1983 provides a remedy against "any person" who, acting under color of state law, deprives another of rights protected by the Constitution. 42 U.S.C. § 1983. In *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local government entities are included among those persons to whom § 1983 applies. *Monell,* 436 U.S. at 690, 98 S.Ct. at 2035. At the same time, the Court made it clear that local government entities may not be held liable on a respondeat superior theory; "[i]nstead it is [only] when [the] execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037; *see also Board of the County Commissioners v. Brown,* --- U.S. ----, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (discussing in detail "policy" requirement for triggering municipal liability). In *City of Canton v. Harris,* 489 U.S. 378, 386-92, 109 S.Ct. 1197, 1203-06, 103 L.Ed.2d 412 (1989), the Supreme Court further extended the scope of local government liability, holding that the "failure to train" employees could itself constitute a governmental "policy" or "custom" for which a local government could be liable, if the failure to train evidenced a "deliberate indifference" to the constitutional rights of those with whom government employees came in contact. *Canton,* 489 U.S. at 388, 109 S.Ct. at 1204.

Wyke tries to escape the import of *DeShaney* by relying on *Canton*'s failure to train theory. However, to prevail on a § 1983 claim against a local government entity, a plaintiff must prove both that her harm was caused by a constitutional violation and that the government entity is responsible for that violation. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 1065, 117 L.Ed.2d 261 (1992); *Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1528 (11th Cir.1996). *Canton* discussed only the second issue, i.e., whether the city's "policy" was responsible for its employee's violation of the plaintiff's constitutional rights. For purposes of its discussion, the Court

assumed that those rights had indeed been violated. *Collins,* 503 U.S. at 122-23, 112 S.Ct. at 1067-68; *Canton,* 489 U.S. at 389 n. 8, 390 n. 10, 109 S.Ct. at 1205 n. 8, 1206 n. 10; *see also Board of the County Commissioners v. Brown,* --- U.S. ----, ----, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 ("In *Canton,* we did not foreclose the possibility that *evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.*") (emphasis added). We cannot make the same assumption. Before addressing whether the School Board can be held liable for a failure to train its employees, we must first determine whether those employees violated any of Wyke's constitutional rights by failing to discharge some constitutional duty owed directly to Shawn (and thus indirectly owed to Wyke), or some constitutional duty owed directly to Wyke. *See Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir.1996) (stating that "inquiry into a government entity's custom or policy is relevant only when a constitutional deprivation has occurred"). *DeShaney,* at least in part, mandates that we answer that question in the negative.

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security." *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1002. Only "in certain limited circumstances [does] the Constitution impose[ ] upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004. Those circumstances are present when the state affirmatively acts to restrain an individual's freedom to act on his own behalf, either "through incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* at 200, 109 S.Ct. at 1005.

Wyke first submits that, because Shawn was a minor child in the custody of the school

pursuant to Florida's compulsory school attendance laws, the school had a constitutional duty to protect him from harming himself. We explicitly reject that contention. Compulsory school attendance laws alone are not a "restraint of personal liberty" sufficient to give rise to an affirmative duty of protection. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (recognizing that public schools do not have such a degree of control over children as to give rise to a constitutional duty to protect); *Russell v. Fannin County Sch. Dist.,* 784 F.Supp. 1576, 1581-83 (N.D.Ga.) (ruling that compulsory school attendance laws do not trigger duty of protection between state and student), *aff'd without opinion,* 981 F.2d 1263 (11th Cir.1992); *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 732 (8th Cir.1993) (same); *Maldonado v. Josey,* 975 F.2d 727, 732-33 (10th Cir.1992) (same); *D.R. v. Middle Bucks Area Voc. Tech. Sch.,* 972 F.2d 1364, 1371-73 (3d Cir.1992) (same); *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990) (same); *see also Wright v. Lovin,* 32 F.3d 538, 540 (11th Cir.1994) (holding that student's voluntary attendance at summer school did not impose affirmative duty of protection on school officials). By mandating school attendance, the state simply does not restrict a student's liberty in the same sense that it does when it incarcerates prisoners or when it commits mental patients involuntarily. Absent that type of restraint, there can be no concomitant duty to provide for the student's "safety and general well-being." *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005; *see also Taylor v. Ledbetter,* 818 F.2d 791, 797 (11th Cir.1987) (holding that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child in a mental health facility" that state can be held liable for failure to protect child against injuries caused by foster parents); *Russell,* 784 F.Supp. at 1581-84 (reasoning that state does not take responsibility for child's entire life by mandating school attendance); *Dorothy J.,* 7 F.3d at 732 (same); *Maldonado,* 975 F.2d at 733 (same); *Middle Bucks,* 972 F.2d at 1371 (same); *Alton,* 909

F.2d at 272 (same).

Wyke next asserts that by "cutting off" Shawn's "private sources of aid," the school rendered Shawn "more vulnerable to harm," and thereby incurred an affirmative duty to protect him. The Supreme Court's decision in *DeShaney* may have left the door open for that argument, but under the facts of this case, Wyke has not persuaded us to let it remain so. *DeShaney* expressly rejected the assertion that the state incurred a duty of protection merely because "the [s]tate knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger." *DeShaney,* 489 at 197-98, 109 S.Ct. at 1003-04. An affirmative duty to protect, according to the Court, arises from limitations the state places upon an individual's ability to act on his own behalf, "not from the [s]tate's knowledge of the individual's predicament or from its expressions of intent to help him...." *Id.* at 200, 109 S.Ct. at 1005. Trying to reconcile these statements with the Court's language about rendering an individual "more vulnerable to harm," we can only infer that, to venture into the realm of possible state liability, the state must do something more than say, "We'll take care of it."

Wyke submits that school officials "affirmatively prevented" her from saving Shawn's life. Unfortunately, the only things Wyke can point to in support of that assertion are Bryan's statement to Morton that he would "take care" of Shawn's situation, and Morton's testimony that, absent Bryan's assurances, she would have called Wyke directly. It was not Bryan, however, that prevented Morton from calling Wyke. Morton herself chose not to call Wyke. Bryan did not, either by verbal or physical act, restrain Morton from picking up her telephone. Morton simply assumed that after speaking with Bryan, she did not need to.[15] Wyke cannot recharacterize that decision, which was

---

[15]Morton's assumption was perfectly reasonable under the circumstances. We commend Morton for recognizing Shawn's plight and for taking action to prevent the risk of Shawn's death from becoming an awful reality.

made by a private person under no obligation to act, as the school's decision to prevent Wyke or anyone else from helping Shawn. If she could, perhaps our analysis would have been different. *See Kneipp v. Tedder,* 95 F.3d 1199, 1209 (3rd Cir.1996) (finding that police officer exercised his authority to render intoxicated plaintiff more vulnerable to harm); *Salas v. Carpenter,* 980 F.2d 299, 308 (5th Cir.1992) (noting that defendant did not "use his authority as a state officer to prevent any rescue, rather he exercised his authority to replace one rescue effort with another"); *Freeman v. Ferguson,* 911 F.2d 52, 54-55 (8th Cir.1990) (recognizing potential liability where plaintiff could show that police officer directed other officers not to stop conduct of third party); *Ross v. United States,* 910 F.2d 1422, 1430-31 (7th Cir.1990) (confirming potential liability where city's rescue policy "actually contemplated that some persons would die for the sake of preventing harm to private rescuers"); *Hamilton ex rel. Hamilton v. Cannon,* 864 F.Supp. 1332, 1336 (M.D.Ga.1994) (ruling that plaintiff stated § 1983 claim where police officer cleared area around drowning victim and interrupted bystander's CPR efforts), *rev'd in part,* 80 F.3d 1525 (11th Cir.1996). We need not address that possibility here.

As a final attempt to establish a constitutional violation, Wyke argues that the school had an independent constitutional duty to notify her of her son's suicide attempts. When asked during oral argument for the best authority supporting such a proposition, Wyke provided none. We decline to wade through the uncharted waters of substantive due process merely because Wyke's counsel "can think of no higher right to the care, management, or custody of a child than knowing about when that child faces an immediate life-threatening emergency." We have no doubt that such information is vitally important to a parent, but absent any authority, we will heed the Supreme Court's caution against expanding the concept of substantive due process. *See Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) ("[T]he [Supreme] Court has

always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (citations omitted). The trial court did not err in granting the School Board's motion for judgment as a matter of law on Wyke's § 1983 claim.

B.

The School Board asserts that the trial court erred in denying its motion for judgment as a matter of law on Wyke's state law claim. The Board argues that its duty to supervise Shawn did not include any obligation to prevent Shawn from committing suicide at a time and place when Shawn was not under the Board's supervision and control. We disagree, but limit our holding to the facts of this case. We hold only that, when a child attempts suicide at school and the school knows of the attempt, the school can be found negligent in failing to notify the child's parents or guardian.

Florida schools have a duty to supervise students placed within their care. *Rupp v. Bryant,* 417 So.2d 658, 666 (Fla.1982); *La Petite Academy, Inc. v. Nassef,* 674 So.2d 181, 182 (Fla. 2nd Dist.Ct.App.1996); *Doe v. Escambia County Sch. Bd.,* 599 So.2d 226, 227 (Fla. 1st Dist.Ct.App.1992). That duty is operational, not discretionary, and the school is not entitled to sovereign immunity. *Doe,* 599 So.2d at 227; *Comuntzis v. Pinellas County Sch. Bd.,* 508 So.2d 750, 753 (Fla. 2nd Dist.Ct.App.1987). In carrying out the duty to supervise, school officials and teachers must use the degree of care "that a person of ordinary prudence, charged with the duties involved, would exercise under the same circumstances." *Collins v. School Bd. of Broward County,* 471 So.2d 560, 564 (Fla. 4th Dist.Ct.App.1985); *Nassef,* 674 So.2d at 182. A breach of the supervisory duty exposes a school to liability for reasonably foreseeable injuries caused by the failure to use ordinary care. *See Roberson v. Duval County Sch. Bd.,* 618 So.2d 360, 362 (Fla. 1st Dist.Ct.App.1993);

*Collins,* 471 So.2d at 563.

In *Rupp v. Bryant,* 417 So.2d 658, 666-68 (Fla.1982), the Supreme Court of Florida considered whether a school breached its duty of supervision to a student injured while participating in an off-campus, after-school initiation into a school-sponsored organization. Prior to the student's injury, the "Omega Club" had a reputation for violating school board regulations. The Club was required to obtain approval for all extracurricular outings, and was also required to have their faculty advisor present at all Club meetings. *Rupp,* 417 So.2d at 660. During one of the Club's meetings, which was unattended by the faculty advisor, the Club conducted a "hazing" ceremony as part of its initiation. *Id.* That ceremony left one student permanently paralyzed. *Id.*

The court began its analysis by recognizing that the school's supervisory duty originates from the notion that school employees stand partially in the place of a student's parents. *Id.* at 666. Mandatory schooling, according to the court, forces parents to rely on schools to protect their children during school activities. *Id.* Whether that protection extended to preventing an injury that did not occur during the school day or on school premises, however, presented a problem for the court. *Id.* The issue forced the court to examine the "scope" of the "duty to supervise." *Id.*

The court's first approach to defining the school's duty was "expressed in terms of Hohfeldian correlatives"—a "duty [to supervise] exists only to the extent that the school and its employees have the authority to control the behavior of a student." *Id.* School officials, under both state statutes and school regulations, had the authority to control the activities of the Omega Club, regardless of where or when its meetings were held. *Id.* at 667. As a consequence, the court reasoned, the school had the correlative duty to supervise those meetings, regardless of where or when they were held. *Id.*

The court's second approach to defining duty was "more pragmatically and socially oriented, and assesse[d] the interests of each party and society to determine whether a duty should be

imposed." *Id.* The court realized that students obviously have an interest in not suffering harm, but also recognized that schools have an interest in avoiding responsibility for duties they cannot realistically carry out. *Id.* The court additionally emphasized factors such as the societal interest in the activity surrounding the injury, the school's manifestation of responsibility for the activity, and the reasonableness of imposing responsibility upon the school. *Id.* at 667-68. Applying those factors, the court found that school clubs pursue worthwhile social activities and have important socializing benefits for students. *Id.* Further, given the school's manifestation of control through sponsorship and regulation of the Club, the court did not believe that imposing a duty of supervision on school officials was unreasonable. *Id.* at 668. In sum, the court found that "under these conditions social utility [was] enhanced by imposition of a duty and the school [was] not unduly burdened." *Id.*

Since *Rupp,* both Florida's legislature and its courts have relied much more heavily upon the first approach to defining the school's duty of supervision. *See* Fla. Stat. Ann. § 232.25 (West 1997 Supp.) (granting school authority over students and limiting duty of supervision to certain times and places);[16] *Doe v. Escambia,* 599 So.2d 226, 227-28 (Fla. 1st Dist.Ct.App. 1992) (determining scope

---

[16]The current version of chapter 232.25 states:

> (1) Subject to law and rules and regulations of the state board and of the school board, each pupil enrolled in a school shall:
>
> > (a) During the time he or she is being transported to or from school at public expense;
> >
> > (b) During the time he or she is attending school;
> >
> > (c) During the time he or she is on the school premises participating with authorization in a school-sponsored activity; and
> >
> > (d) During a reasonable time before and after a pupil is on the premises for attendance at school or for authorized participation in a school-sponsored

of supervisory duty from statutes granting school and teachers authority to control students, school regulations adopted to implement those statutes, and circumstances of case); *O'Campo v. School Bd. of Dade County,* 589 So.2d 323, 325 (Fla. 3rd Dist.Ct.App.1991) (recognizing that duty to

---

activity, and only when on the school premises,

be under the control and direction of the principal or teacher in charge of the school, and under the immediate control and direction of the teacher or other member of the instructional staff or of the bus driver to whom such responsibility may be assigned by the principle. However, the state board or the district school board may, by rules and regulations, subject each pupil to the control and direction of the principal or teacher in charge of the school during the time he is otherwise en route to or from school or is presumed by law to be attending school.

(2) There is a rebuttable presumption that the term "reasonable time" means 30 minutes before or after the activity is scheduled or actually begins or ends, whichever period is longer. A school or school district may, by policy or other formal action, assume a longer period of supervision. Casual or incidental contact between school district personnel and students on school property shall not result in a legal duty to supervise outside of the reasonable times set forth in this section, provided that parents shall be advised in writing twice per year or by posted signs of the school's formal supervisory responsibility and that parents should not rely on additional supervision. The duty of supervision shall not extend to anyone other than students attending school and students authorized to participate in school-sponsored activities.

Fla. Stat. Ann. § 232.25 (West 1997 Supp.). The version of chapter 232.25 in effect at the time of Shawn's death stated:

Subject to law and rules and regulations of the state board and of the school board, each pupil enrolled in a school shall, during the time he is being transported to or from school at public expense, during the time he is attending school, and during the time he is on the school premises, be under the control and direction of the principal or teacher in charge of the school, and under the immediate control and direction of the teacher or other member of the instructional staff or of the bus driver to whom such responsibility may be assigned by the principle. However, the state board or the district school board may, by rules and regulations, subject each pupil to the control and direction of the principal or teacher in charge of the school during the time he is otherwise en route to or from school or is presumed by law to be attending school.

Fla. Stat. ch. 232.25 (1989) (amended 1995 & 1996).

supervise exists "when school is entrusted with [students'] care"); *Collins v. School Bd. of Broward County,* 471 So.2d 560, 564 (Fla. 4th Dist.Ct.App.1985) (reasoning that because school had "absolute right" to control student behavior at time of student's injury, school also had corresponding duty of supervision); *see also Brantly v. Dade County Sch. Bd.,* 493 So.2d 471, 471-72 (Fla. 3rd Dist.Ct.App.1986) (stating that duty of supervision owed to children riding school bus is measured by statute that grants bus drivers authority to control children). If we too were to rely solely on the *Rupp* court's first approach, we would conclude that the School Board had no authority to control Shawn's behavior while he was at home, that the Board had no duty to supervise Shawn while he was at home, and that consequently, the Board could not be liable for Shawn's death because it occurred at home. That result, however, does not comport with *Rupp*'s examination of the practical and just causes for imposing a duty. We choose instead to follow the "more pragmatically and socially oriented" approach to defining the school's supervisory duty. *See Rupp v. Bryant,* 417 So.2d 658, 667 (Fla.1982) (" 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection") (quoting William Prosser, *The Law of Torts,* 325-26 (4th ed.1971)); *see also Boynton v. Burglass,* 590 So.2d 446, 452 (Fla. 3rd Dist.Ct.App.1991) (Schwartz, C.J., dissenting) ("The 'finding' that there is no duty is nothing more than a tautology. The court finds no duty because it thinks there should be no liability; it does not conclude that there is no liability because it has 'found' that there is no duty.").

As the Florida Supreme Court did in *Rupp,* we recognize the various interests involved in this case. Students have an interest in not suffering harm and in receiving appropriate care from their parents. Schools have an interest in avoiding responsibility for duties they cannot reasonably carry out. Parents have an interest in knowing when their children are in need of medical attention

and in providing them with that attention. Society as a whole has a strong interest in ensuring the health and well-being of its children.

The School Board validly claims that it cannot reasonably be expected to solve all the problems faced by children in today's society. The school's primary function is to educate our children, not to replace their parents. In the absence of an explicit mandate for schools to provide suicide intervention/prevention programs, that premise alone is sufficient to foreclose liability for the Board's failure to hold Shawn in protective custody, its failure to provide or procure counseling services for Shawn, and its failure to provide Shawn with appropriate support and guidance. We cannot so easily dispose of the Board's failure to notify Wyke of Shawn's suicide attempts.

The School Health Services Act ("Act"), Fla. Stat. Ann. § 402.32 (West 1993), pronounces the State Legislature's finding that "health services conducted as a part of the total school health program should be carried out to appraise, protect, and promote the health of students."[17] *Id.* § 402.32(2). School "health services" are intended to "supplement, rather than replace parental responsibility and are designed to encourage parents to devote attention to child health, to discover health problems, and to encourage use of the services of their physicians, dentists, and community health agencies." *Id.* The Act requires public health units, jointly with district school boards and local school health advisory committees, to develop "health services" plans, which at a minimum must include provisions for "[m]eeting emergency health needs" and "[c]onsult[ing] with a student's parent or guardian regarding the need for health attention by the family physician, dentist, or other specialist when definitive diagnosis or treatment is indicated." *Id.* § 402.32(5)(*l*), (5)(*o*); *see also* Fla. Stat. ch. 230.2313(3)(a) (1989) (repealed 1994) (requiring, as part of coordinated "student

---

[17]The School Health Services Act was also in effect at the time of Shawn's death. Fla. Stat. ch. 402.32 (1989).

services program," provision of "guidance services," including "consultation with parents, faculty, and out-of-school agencies concerning student problems and needs"); Fla. Stat. ch. 230.2313(b) (1989) (repealed 1994) (requiring, as part of coordinated "student services program," provision of "psychological services," including "consultation and counseling with parents, students, and school personnel"). The Act also authorizes the State Department of Health and Rehabilitative Services ("HRS") to promulgate rules necessary to implement the Act's requirements. Fla. Stat. Ann. § 402.32(8) (West 1993).

At the time of Shawn's death, the HRS's School Health Services Manual ("Manual") devoted an entire chapter to meeting students' emergency health needs. Florida Dept of Health & Rehabilitative Services, *School Health Services,* HRS Manual No. 150-25, ch. 6 (Feb. 1, 1989). The information presented in that chapter was intended "to provide a convenient guide for emergency situations." *Id.* at 6-1. It was not intended "as a guide for the diagnosis and treatment of chronic health problems of the school aged child." *Id.* Nevertheless, the Manual's guidelines emphasized one common theme: "In the event that an accident or serious illness occur[red] during the school day, the school [was] obligated to immediately notify the student's parents or responsible person designated by the parents." *Id.* at 6-2; *see also id.* at 6-4 (setting out emergency health standards and specifying that "[p]arents should be notified of injury or sudden illness"); *id.* at 6-7 (providing emergency plan of action, which included notifying parent or guardian of student's condition); *id.* at 6-13 (requiring consultation with parents before student with injury or sudden illness was permitted to leave school).

The Board's best response argument is that Shawn was not "injured" at school and was not suffering from any "sudden illness" for which he needed emergency medical care. We agree that the health service programs are obviously geared more towards the school's responsibilities in cases

of physical injury or illness, but the HRS Manual also contemplated the need for medical attention when children were in an "acute emotional state." *See* Florida Dept of Health & Rehabilitative Services, *School Health Services,* HRS Manual No. 150-25, at 6-6 thru 6-7 (Feb. 1, 1989) (classifying types of emergencies, listing appropriate responses, and specifying "acute emotional state" as situation in which it was desirable to provide "medical consultation" within one hour). If ever there was a situation where a "person of ordinary prudence" would recognize "an acute emotional state," this was it. Shawn did not merely seem unhappy. Shawn did not merely talk about committing suicide. He twice tried to hang himself from the rafters in the school's restroom. The workings of the human mind are truly an enigma, but we do not believe (and neither did the jury) that a prudent person would have needed a crystal ball to see that Shawn needed help and that if he didn't get it soon, he might attempt suicide again. *See Boynton v. Burglass,* 590 So.2d 446, 450 (Fla. 3rd Dist.Ct.App.1991) (finding no common law duty for psychiatrist to warn potential victims because that duty would require psychiatrist "to foresee a harm which may or may not be foreseeable, depending on the clarity of his crystal ball"); *see also Paddock v. Chacko,* 522 So.2d 410, 414 (Fla. 5th Dist.Ct.App.1988) (describing science of psychiatry as "penultimate grey area").

The risk of a child's death substantially outweighs the burden of making a phone call. The statutory provisions discussed above, together with the regulatory guidelines, evidence both the expectation and the reasonableness of schools having to notify parents of emergency health problems that arise or become clearly evident while children are at school. If "a person of ordinary prudence" would recognize an emergency health need, we see no reason why, as part of their duty to supervise, school officials and teachers should not also recognize them. If "a person of ordinary prudence" would notify a student's parents of such an emergency, we see no reason why, as part of their duty to supervise, school officials and teachers should not also notify a student's parents. The

failure to discharge those obligations can subject the school to possible liability for reasonably foreseeable injuries.

The Board's final argument is that, as a matter of law, the school cannot be held liable for Shawn's death because it was a suicide. As a general rule, absent some type of custodial relationship, one cannot be held liable for the suicide of another. *Paddock v. Chacko,* 522 So.2d 410, 416 (Fla. 5th Dist.Ct.App.1988). The rule's underlying rationale is that suicide constitutes an independent, intervening cause, which is not ordinarily foreseeable. *White v. Whiddon,* 670 So.2d 131, 134 n. 2 (Fla. 1st Dist.Ct.App.1996); *Sogo v. Garcia's National Gun, Inc.,* 615 So.2d 184, 186 (Fla. 3rd Dist.Ct.App.1993). The circumstances of this case, however, made it quite possible for the jury to conclude that Shawn's suicide was foreseeable:

> If the intervening cause is one which in ordinary human experience is reasonably to be anticipated, *or one which the defendant has reason to anticipate under the particular circumstances,* the defendant may be negligent, among other reasons, because of failing to guard against it; or the defendant may be negligent only for that reason.

*Sogo,* 615 So.2d at 186 (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* 303 (5th ed.1984)); *see also Schmelz v. Sheriff of Monroe County,* 624 So.2d 298, 299 (Fla. 3rd Dist.Ct.App.1993) (stating that whether an intervening cause is foreseeable is question for trier of fact). We can think of no other facts that would have given school officials more reason to anticipate Shawn's suicide than Shawn's two recent, overt suicide attempts. The trial court did not err in denying the Board's motion for judgment as a matter of law.

IV.

In *Fabre v. Marin,* 623 So.2d 1182, 1185 (Fla.1993), the Supreme Court of Florida held that Florida's comparative fault statute, Fla. Stat. Ann. § 768.81 (West 1997 Supp.), requires fault to be "apportioned among all responsible entities who contribute to an accident even though not all of

them have been joined as defendants."[18] *Nash v. Wells Fargo Guard Servs.,* 678 So.2d 1262, 1263

(Fla.1996). Pursuant to the *Fabre* decision, the verdict form in this case permitted the jury, if it

found that the School Board was not solely responsible for Shawn's death, also to apportion liability

to Wyke and Schmidt (Shawn's grandmother). The trial court did not allow the jury to apportion

liability to Shawn, because Shawn had not committed a negligent act, but rather an intentional one.

The jury returned a verdict for Wyke, listing damages in the amount of $500,000, and attributing

33% of the fault to the School Board, 32% to Wyke, and 35% to Schmidt. The court entered a

$165,000 judgment in favor of Wyke,[19] that being the portion of the total damage award attributed

---

[18]Chapter 768.81 provides:

> (3) Apportionment of Damages.—In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability....
>
> (4) Applicability.—
>
> > (a) This section applies to negligence cases. For purposes of this section, "negligence cases" includes, but is not limited to, civil actions for damages based upon theories of negligence, strict liability, products liability, professional malpractice whether couched in terms of contract or tort, or breach of warranty and like theories. In determining whether a case falls within the term "negligence cases," the court shall look to the substance of the action and not the conclusory terms used by the parties.
> >
> > (b) This section does not apply to any action brought by any person to recover actual economic damages resulting from pollution, [or] to any action based upon an intentional tort....

Fla. Stat. Ann. § 768.81(3), (4) (West 1997 Supp.).

[19]The first Judgment entered in this case was awarded to "Carol Wyke, as Personal Representative of the Estate of Shawn David Wyke." R3-134. For reasons we are unconcerned with here, the amount of that award was later changed. The Amended Judgment, however, was entered "in favor of plaintiff Carol Wyke." The parties have apparently ignored the distinction between Wyke suing and recovering on her own behalf and that of Wyke suing and recovering on Shawn's behalf; on remand, we suggest the parties rectify this procedurally confusing

to the School Board.

Wyke argues that the trial court improperly permitted the jury to attribute liability to her and Schmidt. Wyke claims that, as a matter of law, neither she nor Schmidt could be found negligent because there was no evidence that either one had any knowledge of Shawn's suicidal intent. The Board counter-argues that the court erred in not also permitting the jury to apportion liability to Shawn himself, for if Shawn's death was anyone's "fault," it was certainly his own.[20]

### A.

Wyke relies on *Rafferman v. Carnival Cruise Lines, Inc.,* 659 So.2d 1271, 1273 (Fla. 3rd Dist.Ct.App.1995) to establish the rule that, absent knowledge of "suicidal tendencies," one cannot be negligent by failing to prevent the suicide of another. In *Rafferman,* the widowed plaintiff of a seaman who jumped overboard filed suit against the shipowner, claiming that the owner had failed to exercise reasonable care in preventing her husband's suicide. *Id.* at 1272. The trial court entered summary judgment in favor of the shipowner on the grounds that the suicide was not foreseeable as a matter of law. *Id.* The Third District Court of Appeal affirmed. *Id.*

The *Rafferman* plaintiff based her argument on the requirement that shipowners take reasonable precautions to protect seamen from dangers—including dangers stemming from their own physical or mental condition—of which the owners are, or should be, aware. *Id.* The plaintiff in *Rafferman,* however, presented no evidence to suggest that the owner knew or should have known of her husband's suicidal condition. The evidence revealed only that the husband, who had no history of mental difficulty, had become "visibly and obviously depressed and abnormal" because

situation.

[20]As to the jury instructions, the Board also argues that the court improperly instructed the jury on its duty to Shawn and on the evidence concerning the Board's failure to train its employees. Those issues are without merit, and we decline to discuss them.

of a death in the family. *Id.* Other than that, there was nothing from which the owner could have inferred that the husband might harm himself. *Id.* The court ruled that such evidence was insufficient to expose the shipowner to liability, and stated that for a shipowner to incur liability, "there must be evidence "of a serious medical problem, so as to put [the shipowner's] personnel on notice that the seaman required protective precautions to ensure his safety.' " *Id.* (quoting *Estate of Larkins v. Farrell Lines, Inc.,* 806 F.2d 510, 514 (4th Cir.1986)).

The *Rafferman* decision was based on federal maritime law and the causes of action available under the Jones Act, 46 U.S.C. app. § 688 (1997 Supp.). In *Schmelz v. Sheriff of Monroe County,* 624 So.2d 298 (Fla. 3rd Dist.Ct.App.1993), the Third District Court of Appeal held that, under Florida law, where there was conflicting evidence regarding the foreseeability of a prisoner's suicide, the question of whether the suicide was foreseeable was for the jury. *Id.* at 299. Likewise, we think there was sufficient conflicting evidence in this case to submit the issue of Wyke and Schmidt's negligence to the jury. Schmidt testified that both she and Wyke thought Shawn should receive counseling for anger problems, which they had both observed. Both Schmidt and Wyke were aware that Shawn had behavioral problems at school, which included fights with other children. A jury could reasonably conclude from these and other descriptions of Shawn's behavior that an ordinarily prudent person in Wyke or Schmidt's position would have foreseen that Shawn needed help. We do not believe the court erred in submitting Wyke and Schmidt's names to the jury.

B.

The question of whether the trial court should have included Shawn's name on the jury verdict form presents a somewhat more complicated issue. In *Stellas v. Alamo Rent-A-Car, Inc.,* 673 So.2d 940 (Fla. 3rd Dist.Ct.App.1996), *rev. granted,* 683 So.2d 485 (Fla.1996),[21] the Third District

---

[21]This case was argued before the Florida Supreme Court in January, 1997.

Court of Appeal held that it was not error to allow a jury to apportion liability between negligent and intentional tortfeasors. *Stellas,* 673 So.2d at 942. The plaintiffs in *Stellas* rented a car from defendant Alamo Rent-A-Car in Orlando, Florida, and made arrangements to return the car in Miami. *Id.* at 941. While in Miami, the plaintiffs took a wrong turn off the expressway and entered a high crime area. *Id.* At a stop light, Bernard Aaron smashed the car's passenger window, grappled with one of the plaintiffs, and took her purse. *Id.* The plaintiffs filed suit against Alamo, claiming that Alamo knew or should have known of the dangers of touring in certain areas of Miami, especially with a Rent-A-Car bumper sticker, and should have warned the plaintiffs of the danger. *Id.*

Discussing Florida's comparative fault statute, the court held that the unmistakable intent of section 768.81 was to limit a defendant's liability to only his percentage of "fault." The court looked to the dictionary definition of fault, and found nothing to suggest that intentional actors should be excluded from the blameworthy individuals who are supposed to share liability under section 768.81. *See id.* at 942-43 ("The whole fault, of which a negligent defendant's acts are but a part, is broad enough to encompass an intentional tortfeasor's acts. One dictionary defines fault as ... "Culpability; the blame or responsibility of causing or permitting some untoward occurrence; the wrongdoing or negligence to which a specified evil is attributable.' ") (quoting *The Oxford English Dictionary* (1933)). Alamo was partially to blame for not warning the plaintiffs, but Bernard Aaron was also partially to blame for injuring them. *Id.* According to the court, Alamo was thus entitled to have its liability limited to only that "fault" the jury believed was Alamo's. *Id.*

The *Stellas* decision is in direct conflict with the Fourth District Court of Appeals' decision in *Slawson v. Fast Food Enters.,* 671 So.2d 255 (Fla. 4th Dist.Ct.App.1996), *rev. dismissed,* 679 So.2d 773 (Fla.1996). In *Slawson,* Charles Kidd attacked and raped the plaintiff in the ladies'

restroom of a Burger King restaurant. *Slawson,* 671 So.2d at 256. The plaintiff filed suit against Burger King, claiming that the restaurant had negligently failed to protect her, as a business invitee, from the reasonably foreseeable intentional attack of a third party. *Id.* The trial judge determined that the plaintiff's claim was governed by section 768.81, and consequently requested the jury to apportion fault between Kidd and Burger King. *Id.* The jury found Kidd 80% responsible for the plaintiff's injuries and found Burger King 20% responsible. *Id.*

On appeal, the Fourth District Court of Appeals reversed. The Fourth District could not reconcile Burger King's duty to protect the plaintiff from foreseeable intentional assaults with Burger King's assertions that, under section 768.81, it was entitled to diminish or defeat its liability for the breach of that duty by transferring liability to the very intentional actor it was charged with protecting the plaintiff from:

> If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, or intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

*Id.* at 258-59 (quoting *Holley v. Mt. Zion Terrace Apartments, Inc.,* 382 So.2d 98, 101 (Fla. 3rd Dist.Ct.App.1980)).

The conflict in Florida's law has a substantial effect on the outcome of this case. If we were to follow the *Stellas* court's reasoning, then the jury should have been allowed to consider how much of Shawn's death was Shawn's own fault. Our only choice would be to remand this case for a new trial. If we were to follow the *Slawson* reasoning, then we need only determine whether Wyke and Schmidt were properly included on the verdict form. We have already expressed our belief that the court was to correct to include them, and would thus affirm. While we could make a guess as to which of these approaches is the proper one, we think the more prudent course is to submit the issue to the Florida Supreme Court. Accordingly, we respectfully certify the following question of law

to the Supreme Court of Florida:

> Does Florida's comparative fault statute, Fla. Stat. Ann. § 768.81 (West 1997 Supp.), require the allocation of "fault" between both negligent and intentional tortfeasors?

Our statement of the question is not meant to limit the scope of inquiry by the Supreme Court of Florida: " "[T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case....' " *Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1535 (11th Cir.1996) (quoting *Martinez v. Rodriquez,* 394 F.2d 156, 159 n. 6 (5th Cir.1968)). The entire record in this case, together with copies of the parties' briefs, is transmitted herewith.

QUESTION CERTIFIED.

V.

We AFFIRM the trial court's (1) exercise of jurisdiction, (2) grant of judgment as a matter of law on Wyke's § 1983 claim, and (3) denial of judgment as a matter of law on the state law claim. We find that both the evidence and the law support the jury verdict in the state wrongful death claim. We CERTIFY the *Fabre* defendant issue to the Florida Supreme Court, and WITHHOLD any final decision until we receive the answer to that certification.